☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Data extracted from two cellular phones;<br>blue Apple iPhone & gray Apple iPhone in the<br>custody of Kenosha Co. Sheriff; See Attachments | )<br>)<br>)<br>)<br>)<br>) Case No.24-803M(NJ)<br>**Matter No.: 2023R00308** |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A. This Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 3/13/2024 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Nancy Joseph _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: 2/28/2024 @ 10:48 a.m. _____

_____
*Judge's signature*

City and state:      Milwaukee, WI _____        Hon. Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## <u>ATTACHMENT A</u>

**Property to Be Searched**

1.      Data extracted from (2) cellular phones further described as;

      f.  Blue Apple iPhone, listed under Kenosha County Sheriff's Department case number 24-304772 inventory #9 and extraction data (**DEVICE 9**)

      g.  Gray Apple iPhone, Kenosha County Sheriff's Department case number 24-304772 inventory #10 and extraction data (**Device 10**)

## ATTACHMENT B

### Particular Things to be Seized

1.      All records on and from the two (2) cellular phones listed under KCSD case number 24-304772 item #9 and #10 (**DEVICE 9** and **Device 10**), related to violations of Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(a)(1)(A) (engaging in a firearms business without a license); 18 U.S.C. § 922(g)(1) (unlawful possession of firearms and ammunition); 18 U.S.C. § 922(d)(10) (sale of a firearm to a person who intends to use it for a felony or a drug trafficking crime); 18 U.S.C. § 933 (trafficking firearms); 18 U.S.C. § 924(c) (possession of a firearm in furtherance of crime of violence or drug trafficking crime); 18 U.S. Code § 1029  (Fraud and related activity in connection with access devices) 18 U.S. Code § 1028A (Aggravated identity theft) 18 U.S.C. § 371 (conspiracy); and 18 U.S.C. § 1341 (mail fraud), between the dates of March 15, 2019 to the present, are being committed or will be committed by Torion R. BROOKS, Nichole BROOKS and others, including:

1.      Items:

      a.   lists of contacts with any identifying information;

      b.   photographs, videos, or other media storage connected to drugs and firearms;

      c.   types, amounts, and prices of drugs and firearms purchased/sold;

      d.   any information related to sources or purchasers of drugs and firearms (including names, addresses, phone numbers, or any other identifying information);

      e.   all bank records, checks, credit card bills, account information, and other financial records related to drug and firearms commerce.

2

2.      Any and all financial records connected to the purchase/sale of firearms or drugs;

3.      Documentation establishing the identity of the individuals in control of the residences;

4.      Any and all financial records connected to the purchase/sale of firearms, and any correspondence regarding other firearms/drug sellers and/or purchasers;

5.      Any evidence of firearm and illegal drugs or controlled substances, paraphernalia associated with controlled substances including scales and other weighing devices as well as packaging materials and containers used to package controlled substances;

6.      Any evidence of proceeds of firearm and drug trafficking activities, including United States currency;

7.      All bank records, checks, credit card bills, account information, and other financial records; financial records, documents, statements, or other evidence of control of bank or other financial accounts and investment funds;

8.      Lists of firearm and drug customers and related identifying information;

9.      Personal address books, telephone bills, photographs, letters, personal notes, documents, and other items or lists reflecting names, addresses, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in firearm and drug trafficking activities.

10.     Any evidence of documents and deeds reflecting the purchase or lease of items obtained with the proceeds from firearm and drug trafficking activities;

11.     Records of off-site locations to store proceeds and other records, including safes, vaults, or lock boxes, safe deposit box keys, records and receipts and rental agreements for storage facilities;

3

12.     Records of mail and communications services, cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/or data.

13.     Evidence of indicia of occupancy, residency, or ownership of premises, including utility bills, telephone bills, loan payment receipts, addressed envelopes, escrow documents and keys.

14.     Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

15.     Records evidencing the use of the Internet Protocol address, including:

    a.  records of Internet Protocol addresses used;

    b.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Data extracted from two cellular phones;<br>blue Apple iPhone & gray Apple iPhone in the custody<br>of Kenosha Co. Sheriff; See Attachments | )<br>)<br>)<br>)<br>)<br>) |

Case No.24-803M(NJ)

**Matter No.: 2023R00308**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A. This Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A); 922<br>(g)(1); 922(d)(10); 933; 924(c);<br>371; 1341; | Engaging in a firearms business without a license; unlawful possession of firearms<br>and ammunition; sale of a firearm to a person who intends to use it for a felony or<br>a drug trafficking crime; trafficking firearms; conspiracy; mail fraud; |

The application is based on these facts:

See attached Affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

GABRIEL LOWRANCE  Digitally signed by GABRIEL LOWRANCE
Date: 2024.02.27 11:01:03 -06'00'

*Applicant's signature*

SA Gabe Lowrance, ATF

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephone _____ *(specify reliable electronic means).*

Date: 2/28/2024

*Judge's signature*

City and state: Milwaukee, WI

Hon. Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT
## Matter No.: 2023R00308

I, Gabriel Lowrance, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am employed as a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") assigned to the Milwaukee Field Office since January 2020. I have been employed as a full-time law enforcement officer for approximately fifteen years. Prior to employment with ATF, I served as a police officer with the Robinson Police Department in Illinois and the Lake Havasu City Police Department in Lake Havasu City, Arizona.

3.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(a)(1)(A) (engaging in a firearms business without a license); 18 U.S.C. § 922(g)(1) (unlawful possession of firearms and ammunition); 18 U.S.C. § 922(d)(10) (sale of a firearm to a person who intends to use it for a felony or a drug trafficking crime); 18 U.S.C. § 933 (trafficking firearms); 18 U.S.C. § 924(c) (possession of a firearm in furtherance of crime of violence or drug trafficking crime); 18 U.S. Code § 1029 (Fraud and related activity in connection with access devices) 18 U.S. Code § 1028A (Aggravated identity theft) 18 U.S.C. § 371 (conspiracy); and 18 U.S.C. § 1341 (mail fraud), are being committed or will be committed by Torion R. BROOKS, Nichole BROOKS and others.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other investigators and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF PROPERTY TO BE SEARCHED

5.     The property to be searched is the data extracted from two (2) cellular phones which can be further identified as the following:

      a.     Blue Apple iPhone, Kenosha County Sheriff's Department case number 24-304772 inventory #9 and extraction data (**DEVICE 9**)

      b.     Gray Apple iPhone, Kenosha County Sheriff's Department case number 24-304772 inventory #10 and extraction data (**DEVICE 10**)

6.     The applied-for warrant would authorize the forensic examination of the devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7.     On August 24, 2023, your affiant initiated a case related to a complaint made to the Milwaukee Police Department by CBC Industries, a business located in North Charleston, South Carolina.  CBC Industries is a manufacturer of firearms and firearms accessories sold online via their website.

8.     The complaint from CBC industries concerned approximately 29 attempted and two completed online purchases of AR-15 firearm parts, totaling approximately $35,000 of AR-15 upper receivers and other AR-15 accessories. The purchases were made from CBC's website using stolen credit card information, and orders used the name Torion R. BROOKS and telephone numbers associated to Torion BROOKS.

2

9.      The purchases occurred between July 27, 2023, and August 8, 2023. The fraudulent purchases were flagged because the billing addresses varied from the delivery addresses.  CBC records showed billing addresses from approximately fourteen different states and shipping addresses at the following locations: 1526A W. Congress, Milwaukee, WI; 4710 N. 30th St, Milwaukee, WI; and 3219 N 46th St, Milwaukee, WI.

10.     In two purchases, CBC Industries communicated with the user of the email address, billyj1730@gmail.com. On July 24, 2023, CBC Industries requested a front and back photo of identification to verify the purchaser's identity.  The user of billyj1730@gmail.com sent a front and back photo of an Arizona driver's license for Torion R. BROOKS ("TORION"). Your affiant reviewed the criminal history of TORION.  TORION has a misdemeanor conviction in Cook County, IL Circuit Court on January 11, 2023, for Unlawful Use of a Weapon. TORION was sentenced to two years of probation.   Your affiant located an Illinois driver's license with an address of 4747 S Dr. Martin Luther King Jr Dr, #2005, Chicago, IL.

11.     Two purchases were delivered to addresses in Milwaukee, WI. The first transaction was an order of six AR-15 upper receivers.  The order was placed on or about July 24, 2023, and totaled approximately $990.  The order was shipped by CBC industries via Federal Express to TORION at 1526A W. Congress, Milwaukee, WI, and were delivered and signed for by "HTBROOKS" on July 31, 2023.

12.     The second order from CBC Industries was placed on or about August 18, 2023. Five items of AR-15 parts and accessories, totaling approximately $1,170.00. The parts were delivered to TORION at 3219 N 46th St, Milwaukee, WI.  The order consisted of AR-15 bolt carrier groups and charging handles, and an AR-15 pistol kit. The AR-15 pistol kits from CBC Industries include parts for an AR-15 pistol but does not include the lower receiver.  Your affiant

3

knows through training and experience that when an AR-15 upper receiver components are paired with an AR-15 lower receiver, the items may readily be converted to a working firearm.

**The Narcotics Activities of Cortez R. Brooks**

13.     Your affiant reviewed a jail call which occurred on January 11, 2023, by Cortez BROOKS, who is currently incarcerated at Fox Lake, WI Correctional Institution ("CORTEZ"). CORTEZ was identified as the uncle of TORION. CORTEZ called TORION at 872-243-4797 (Hereinafter "**SUBJECT PHONE 1**") TORION stated he is in an airport and is on his way to Houston to go grab that "drank." Your affiant knows "drank" to be a term to reference a drink containing promethazine syrup and codeine. Both individuals discussed "bars" and "percs". Your affiant knows these terms to be prescription opioid pills. TORION stated he knows an individual who will travel to pharmacies in small towns for "percs." CORTEZ inquired about suboxone strips. Your affiant knows suboxone strips to be prescription opioids in strip form. CORTEZ and TORION discussed how to obtain opioids and who to sell them to. Additionally, both CORTEZ and TORION discussed "dog". Your affiant knows "dog" to be a term to mean heroin. TORION said he had previously taken an individual a sample. CORTEZ and TORION discussed prices for "dog" and who they can sell it to. CORTEZ said he does not want TORION engaged in physical narcotics sales and wants others to do it on their behalf.

14.     On July 29, 2023, CORTEZ called TORION. CORTEZ and TORION discussed suspected methamphetamine trafficking. CORTEZ wished TORION still had the ice connect. Your affiant knows "ice" to be a term for methamphetamine. Your affiant knows the term "connect" is a term for source of narcotics. TORION said he would attempt phone calls to obtain more information. CORTEZ asked TORION about an individual identified as "Rocko." I believe "Rocko" to be Jermaine C. NASH. TORION said he had previously traveled hours

4

aways for "Rocko" to obtain items. I believe TORION to have transported narcotics for "Rocko." TORION described the travel destination as being hours away. CORTEZ asked if TORION knew "Rocko's" "plug." Your affiant knows "plug" to be a term for a source of narcotics.

15.     On September 5, 2023, CORTEZ and TORION participated in a video visit. When the visit began, TORION was on screen.  TORION displayed an item that appeared to be a cigar.  CORTEZ advised TORION to keep the "weed off the screen" when TORION would show the cigar. This leads me to conclude that TORION was smoking cannabis.  TORION stated he was at the "crib" while smoking in NICHOLE's car.  Your affiant knows NICHOLE to be Nichole R. BROOKS "NICHOLE") the wife of CORTEZ and the aunt of TORION.   Your affiant knows "crib" to be a term for a residence.  TORION said he was getting things "going out here."   CORTEZ advised TORION to focus on "Fat Man."   CORTEZ described TORION's location as a "gold mine" and described the area as less things to worry about.  TORION said he has only been in the area for a few days.

16.     Your affiant believes "Fat Man" to be Rashod BETHANY ("BETHANY"). Your affiant reviewed the criminal history of BETHANY.  BETHANY was found to have convictions on April 21, 2004, in Cook County IL Circuit Court for possession of controlled substance (Felony) and possession of cannabis (misdemeanor).  BETHANY has a felony conviction in United States District Court Northern District of Illinois Eastern Division for conspiracy to possess controlled substance.  BETHANY is a known documented Gangster Disciple (GD) gang member.  BETHANY is also documented as previously being the leader of a group of gang members known to sell narcotics in the "Trigger Town" area on the south side of Chicago, IL.

5

## Firearm Activities

17.     During the aforementioned call on July 29, 2023, TORION stated he is building guns and has learned how to build the AR-15 rifles. TORION spoke about other firearms he was building and described them as little ones and real small, leading me to suspect he could also be speaking about AR-15 pistols.  Your affiant knows TORION ordered AR-15 pistol kits from CBC Industries. TORION described the firearms as ghost guns and described them as a size to fit under a shirt. CORTEZ asked TORION if TORION is making the firearms. TORION explained making them and obtaining the parts via the internet. TORION stated he was looking to stock up.  TORION advised if he decides to sell them, TORION will sell them for $1,500 and the firearms do not cost him more than $300-$400. TORION explained he was looking to stock up. TORION has been spending his time putting firearms together, leading me to believe he is discussing converting AR-15 receivers into fully functioning firearms and stockpiling inventory to be released to the public.

18.     CORTEZ asked if the firearms are five inches. TORION stated the firearms are the same size as a micro draco and shoot 7.62 and 5.56 and the same bullet as an "AK."  Your affiant knows "micro draco" to be an AK-47 pistol.  Your affiant knows 7.62 and 5.56 to be calibers of ammunition that can be fired by an AR-15.  Your affiant also know TORION to have ordered or attempted to order 5" AR-15 pistol kits from CBC Industries.

19.     Your affiant is aware the term "ghost gun" describes a privately made firearm (PMF) that has no serial numbers. These PMFs have become sought after by those engaged in criminal activity because they are easily obtained, and difficult for law enforcement to trace back to a specific possessor or purchaser.

6

**Nichole Brooks**

20.     Your affiant identified a female as NICHOLE, the wife of CORTEZ.  Through the review of jail calls and previously obtained ping data, TORION is known to travel through the states of Wisconsin, Illinois, Minnesota, Indiana, and Iowa.  TORION is known to travel with NICHOLE.  NICHOLE allows TORION use of her vehicle. (Herein after SUBJECT VEHICLE 1) Agents observed TORION driving SUBJECT VEHICLE 1 with NICHOLE as a passenger.

21.     TORION traveled to Albert Lea, MN, during the months of October, November, December of 2023, and January of 2024 and stayed for extended periods with NICHOLE.  Ping data for SUBJECT PHONE 1 indicated the device to be in the area in and around Albert Lea, MN.  During that time TORION placed phone calls to phone number 920-808-1280, known to be the phone of NICHOLE.  NICHOLE has also been present with NICHOLE in the areas of Albert Lea, MN, Fox Lake, WI; Milwaukee, WI; Merrillville, IN; and Chicago, IL, observed by agents through surveillance, cellular data, and review of jail phone calls.

22.     On September 20, 2023, SUBJECT VEHICLE 1 was stopped by the Minnesota State Patrol.  The traffic stop occurred in Austin, MN on Interstate 90 near exit #179.  TORION was the driver of SUBJECT VEHICLE 1 and NICHOLE was the passenger.  NICHOLE identified herself as the owner of the vehicle and TORION was identified as NICHOLE'S "nephew."  TORION identified himself with an Illinois driver's license.  The Minnesota State Patrol report did not indicate an address for TORION.  TORION and NICHOLE were traveling from Fox Lake Correctional Institution.  TORION and NICHOLE had visited CORTEZ.  TORION was issued a warning for speeding and released.

23.     On September 21, 2023, CORTEZ called TORION.  TORION admitted he was pulled over.  TORION described NICHOLE as antsy during the stop.

7

24.     Also on September 21, 2023, CORTEZ contacted NICHOLE.  NICHOLE and CORTEZ discussed being pulled over.  CORTEZ and NICHOLE argued over issues with NICHOLE'S vehicle, use of the vehicle, and TORION being pulled over.  NICHOLE expressed fears of losing her vehicle and being sentenced to penitentiary time.  This leads your affiant to believe the travel by NICHOLE and TORION was involving the trafficking of illegal items and could result in arrest and the possible seizure of SUBJECT VEHICLE 1.

25.     On October 23, 2023, CORTEZ placed a phone call to TORION. CORTEZ asked TORION when TORION would be returning to Milwaukee.  On October 23, 2023, CORTEZ again contacted TORION.  NICHOLE was present during the call.  CORTEZ and NICHOLE argued throughout the call.  CORTEZ suggested TORION could drive for NICHOLE.  TORION expressed an intent to travel by train.

26.     On October 26, 2023, agents conducted surveillance of TORION and NICHOLE. Cellular ping data showed SUBJECT PHONE 1 phone to travel from Albert Lea, MN east on I-90 towards Wisconsin. At approximately 11:28 AM ping data showed SUBJECT PHONE 1 to be in the area of Fox Lake Correctional Institution near Fox Lake, WI. SUBJECT PHONE 1 remained at Fox Lake Correctional Institution until approximately 1:30 PM. SUBJECT PHONE 1 traveled east to the area of Interstate 41 and then south towards Milwaukee, WI. At approximately 4:04 PM in the area of Interstate-94 at Rawson Rd. in Milwaukee County Wisconsin, your affiant observed SUBJECT VEHICLE 1 traveling south towards Chicago, IL on Interstate-94.   Your affiant also observed TORION driving SUBJECT VEHICLE 1, and NICHOLE in the front passenger seat.  Cellular ping data showed SUBJECT PHONE 1 continued to the Chicago, IL. SUBJECT PHONE 1 traveled back to Albert Lea, MN and arrived at approximately 6:35 AM on October 27, 2023.

8

27.     On October 26, 2023, CORTEZ called NICHOLE.  This phone call took place during the time of being in Chicago, IL.  During the call NICHOLE sounded frightened. NICHOLE stated TORION left in a car and described the situation as bad.  NICHOLE was told by TORION to go to TORION's grandfather's residence.  Your affiant knows the grandfather of TORION to be Ronald BETHANY ("BETHANY"). During the same call, NICHOLE described an individual getting into the vehicle with herself and TORION and they drove around the block. TORION then left the area in another car with individuals she did not know but she was told to leave by TORION.  NICHOLE stated she does not like guns or any part of the situation. NICHOLE advised this incident was not part of the plan.  NICHOLE knew a partial license plate for the vehicle TORION left in and wanted to chase after TORION. CORTEZ advised NICHOLE to not follow as she could be shot.

28.     During the same call, CORTEZ continually reassured NICHOLE. CORTEZ stated several times TORION could be somewhere with the individual's discussing money. CORTEZ explained he knows who TORION deals with and mentioned an individual by the name of "Rocko."  CORTEZ stated TORION could be with "Rocko" to get other items and discuss money.  CORTEZ described the situation as part of the game.  In my training and experience I believe the incident described by NICHOLE is consistent with that of a narcotic or firearms transaction.

29.     CORTEZ and NICHOLE discussed going to "Redd's" and CORTEZ described the individual as living on Lockwood.  Your affiant believe "Red" to be Ronald BROOKS, ("RONALD") the father of TORION.  Your affiant knows RONALD to previously live at 1018 N. Lockwood Ave, Chicago, IL, 60651.  During the same call a voice can be heard giving GPS directions.  The voice can be heard giving the direction to turn on to W. Augusta Boulevard.

9

Your affiant knows W. Augusta Blvd and N Lockwood Ave is an intersection on the west side of Chicago, IL approximately two miles from the residence of BETHANY.

30.    On October 27, 2023, CORTEZ contacted NICHOLE.  Ping data indicated NICHOLE and TORION returned to Minnesota.  NICHOLE described the incident on October 26, 2023, as TORION being in a horrible situation and a setback. The details of the incident described by NICHOLE appear consistent with that of some type of narcotics or firearms transaction and the loss of money.

31.    CORTEZ stated TORION should send money.  CORTEZ described the situation as a "snatch and run" and NICHOLE agreed. NICHOLE and CORTEZ agreed they could not help TORION with the issue.  Your affiant believe by the details given by CORTEZ and NICHOLE that the incident they discussed is consistent with theft.  During the same phone call, NICHOLE stated TORION could not smoke all of her weed and that her weed is more expensive, and she can make more money from selling her weed.

32.    On October 30, 2023, your affiant responded to Fox Lake Correctional Institution in Fox Lake, WI.  Your affiant located SUBJECT VEHICLE 1 in the parking lot of the facility. Agents observed TORION enter the driver's seat of the vehicle and drive to the front door of the facility. NICHOLE entered the front passenger seat of the vehicle and SUBJECT VEHICLE 1 left the facility.

33.    Agents continued surveillance and observed SUBJECT VEHICLE 1 travel from Fox Lake Correctional Institution to Milwaukee, WI.  Case agents observed SUBJECT VEHICLE 1 travel to the area of 722 N. Water St in Milwaukee and park on the street.  TORION exited the driver's seat of the vehicle and entered a business.  NICHOLE remained in SUBJECT VEHICLE 1. Agents observed TORION meeting with an unknown black male next to SUBJECT

10

VEHICLE 1. The unknown black male turned and walked across the street and entered a business. TORION departed in SUBJECT VEHICLE 1.

34.     Agents continued surveillance of TORION and NICHOLE. SUBJECT VEHICLE 1 parked in the roadway near 4060 N. 17th St in Milwaukee, WI. Agents observed an unknown individual get into the back seat of the vehicle. Agents observed the same individual emerge from the back seat of the vehicle carrying a rectangular box consistent with that of a firearm box. The individual crossed the street with the box and appeared to unlock the door at 4060 N. 17th St. The individual entered the residence.

35.     SUBJECT VEHICLE 1 traveled to 4710 N 30th St in Milwaukee, WI. Your affiant previously observed TORION at this residence and know this residence to be used by TORION for firearm part deliveries, and other deliveries. Agents observed SUBJECT VEHICLE 1 parked behind the residence. TORION was observed placing a white box consistent with that of a firearm box in a trashcan next to SUBJECT VEHICLE 1.

36.     On November 12, 2023, CORTEZ contacted NICHOLE. NICHOLE was upset over gasoline not being filled in SUBJECT VEHICLE 1 by TORION. NICHOLE described putting gasoline in SUBJECT VEHICLE 1 as needs to be done and part of the agreement. NICHOLE would not allow TORION further use of SUBJECT VEHICLE 1 if he does not refuel the car. NICHOLE advised she is struggling with money and will end everything. NICHOLE refused to beg TORION for money and knows that TORION is making hundreds of dollars and can fill SUBJECT VEHICLE 1 with gasoline. By the details of the "agreement" described by NICHOLE in this phone call, it appears NICHOLE and TORION have made an agreement on the use of SUBJECT VEHICLE 1. The use of SUBJECT VEHICLE 1 by TORION is seemingly

11

part of TORION making money and NICHOLE having knowledge of TORION'S use of SUBJECT VEHICLE 1.

37.     On November 12, 2023, CORTEZ contacted TORION.  TORION and CORTEZ discussed the use of SUBJECT VEHICLE 1 and paying for gasoline in the vehicle.  TORION mentioned he did not want to put gasoline in SUBJECT VEHICLE 1 for NICHOLE to use for pizza deliveries.   Your affiant knows NICHOLE to be employed as a delivery driver for Domino's Pizza in Albert Lea, MN.  CORTEZ and TORION discussed getting another residence in Albert Lea, MN. TORION refused to pay for gasoline for NICHOLE to deliver pizzas. TORION also refused to pay for gas if NICHOLE would do other drop offs.  This leads your affiant to believe SUBJECT VEHICLE 1 is being used to deliver other items outside of pizza deliveries related to NICHOLE'S occupation.

38.     On November 20, 2023, CORTEZ contacted NICHOLE from Fox Lake (WI) Correctional Institution.  NICHOLE and CORTEZ discussed NICHOLE visiting CORTEZ on this day.  NICHOLE and CORTEZ discussed picking up TORION.  Background noise on the call was consistent with a GPS notification with directions to Milwaukee, WI.

39.     On November 20, 2023, agents conducted surveillance of 4710 N. 30th St, in Milwaukee, WI.  Agents observed SUBJECT VEHICLE 1 parked in front of the residence. NICHOLE was observed seated inside SUBJECT VEHICLE 1. Agents observed TORION approach SUBJECT VEHICLE 1.  TORION opened the rear passenger and driver side doors and leaned into SUBJECT VEHICLE 1.  NICHOLE exited the driver's seat of SUBJECT VEHICLE 1 and moved to the front passenger seat.  TORION entered the driver's seat of the vehicle, and the vehicle departed from the residence.

12

40.     Case agents continued surveillance of TORION and NICHOLE.  SUBJECT VEHICLE 1 was driven by TORION towards Interstate 43.  Agents lost sight of the vehicle and terminated surveillance.  Your affiant reviewed cellular data related to SUBJECT PHONE 1.  SUBJECT PHONE 1 traveled southbound to Chicago, IL from Milwaukee, WI after surveillance was terminated.  Cellular data for TARGET PHONE 1 indicated TORION traveled back to Albert Lea, MN hours later.  This travel pattern is consistent with other travel patterns after a visit with CORTEZ by NICHOLE and TORION at Fox Lake Correctional Institution.

41.     On November 16, 2023, your affiant spoke with Captain Brian Schueler of Fox Lake Correctional Institution. Captain Schueler advised CORTEZ was visited by TORION on November 14, 2023.  TORION and CORTEZ were observed drinking from the same juice bottle.  Captain Schueler advised this behavior to be consistent with passing contraband from TORION to CORTEZ.

42.     On November 27, 2023, CORTEZ contacted NICHOLE at approximately 8:12 AM.  These calls took place on November 27, 2023, prior to an in-person visit at Fox Lake Correctional Institution with CORTEZ, TORION, and NICHOLE.  TORION is suspected by Fox Lake Correctional Institution staff of attempting to introduce a white unidentified item of suspected contraband to CORTEZ.

43.     NICHOLE answered the call.  TORION was also present.  The background noise of the call is consistent with being inside a moving vehicle.  CORTEZ asked NICHOLE if "they" came.  CORTEZ also asked TORION if an item came.  TORION did not immediately know to what CORTEZ was referring.   CORTEZ referred to the items as items CORTEZ told TORION to request.  NICHOLE can be heard talking.  TORION began to understand.  This appeared to your affiant to be coded language to conceal what item was requested by CORTEZ. TORION

13

stated to CORTEZ, CORTEZ will be "real happy." TORION stated "Angie" was going "5 in 5" and TORION has figured out how to go "7 in 7." Your affiant knows "Angie" can be a term for cocaine. This appeared to your affiant to be coded language regarding narcotics. CORTEZ asked TORION about "Big John" and getting a vehicle. TORION described it as "not the move" and the vehicle not running well. CORTEZ and TORION discussed looking for a vehicle. TORION expressed interest in improving his credit to obtain a vehicle. CORTEZ suggested TORION could get a job and provide pay stubs. TORION stated he is in the process of having them made by an individual. Your affiant knows through training and experience that pay stubs can be fraudulently made by individuals and will be used when needed to provide proof of employment.

44. On November 27, 2023, at 12:32 PM, CORTEZ placed a second call to NICHOLE. The call was answered by NICHOLE and the background noise was consistent with NICHOLE being in a moving vehicle. TORION can also be heard talking. NICHOLE stated they are still in Chicago. TORION described being in Chicago approximately one hour and went to "the store". TORION stated he is picking up clothes and shoes and has put off doing so each time they have gone to Chicago. TORION further their location as driving in the area of Harvey, IL. Your affiant Harvey, IL to be approximately twenty-two 22) miles south of Chicago, IL. While driving, TORION saw police and wanted to stay away from police. CORTEZ also advised TORION and NICHOLE to stay away from the police. CORTEZ described the police as looking for "pipes, fetty, and boy." Your affiant knows "pipes" to be a term for firearms, "fetty" to be a term for fentanyl, and "boy" to be a term for cocaine. CORTEZ asked TORION about "Rocko" getting "pens." Agents believe "Rocko" to be located in Chicago, IL. Your affiant knows "pens" can be a term for cannabis vape devices. TORION spoke with an individual

14

identified as "Turkish" and was told to come to their "warehouse." TORION advised "Turkish" is in Turkey right now and TORION expressed interest in traveling to Turkey. TORION also described Turkey as being different than America leading your affiant to believe TORION to be referencing the country of Turkey.

45. TORION stated they are in Riverdale. Your affiant Riverdale, IL to be a city approximately 21 miles south of Chicago, IL. A short time later, a sound can be heard in the background consistent with that of a car door opening and shutting. NICHOLE remains on the phone. A second male voice can be heard talking to NICHOLE and TORION and tell TORION to come in. CORTEZ placed a third call to NICHOLE at 1:53 PM. TORION provided their location being in Indiana. Your affiant is aware SUBJECT VEHICLE 1 was observed by Merrillville (IN) Police Department traffic cameras on the same date at approximately 1:32 PM in the area of 73rd Ave & Whitcomb St, Merrillville, IN 46410. CORTEZ placed a fourth call to NICHOLE at 3:28 PM. NICHOLE stated they are on their way to see CORTEZ. TORION advised they are approximately three hours away. Your affiant is aware that SUBJECT VEHICLE 1 was observed by Illinois State Police traffic cameras in the area of 436 W Grand Ave, Chicago, IL 60654. NICHOLE and TORION discuss being stopped in traffic delaying their travel.

46. CORTEZ placed a fifth call to NICHOLE at 4:15 PM. NICHOLE and TORION were still driving. CORTEZ asked NICHOLE about the quality of "pens" she obtained. Your affiant knows "pens" to be cannabis vape devices. NICHOLE stated she obtained ten pens and also obtained one ounce of "weed." NICHOLE advised she is being contacted about the items. NICHOLE believes she can get more at any time. CORTEZ suggested NICHOLE buy more so she does not run out. NICHOLE stated one hundred pens were purchased for $1,200 and

15

possibly "fronted." Your affiant knows "fronted" to mean, typically in narcotic sales, the item is given to the person and the person sells the item and later pays the supplier after the items are sold. CORTEZ believes the $1,200 purchase could be turned into $5,000 when the pens are resold. With the discussion of prices and profit, this led your affiant to believe NICHOLE is actively selling cannabis pens and marijuana.

47.     TORION, NICHOLE, and CORTEZ discussed getting food when they arrive for visitation at Fox Lake Correctional Institution. All three discuss getting a bottle of juice and "Snapple." TORION described the "Snapple Apple" as a "lifesaver" and three begin laughing. Your affiant knows during the visit at Fox Lake Correctional Institution later on the same date, an unidentified item of contraband was suspected to have been passed to CORTEZ by TORION in a Snapple juice bottle in an in-person visit.

48.     Your affiant reviewed reports related to an incident on November 27, 2023, at Fox Lake Correctional Institution. Staff previously observed a pattern of behavior during CORTEZ'S visits after review of video footage from the dates of September 1, 2023, October 30, 2023, November 14, 2023, and November 23, 2023. The pattern of behavior was described as consistent with delivery of contraband from TORION to CORTEZ.

49.     On November 27, 2023, NICHOLE, TORION, and CORTEZ participated in an in-person visit at Fox Lake Correctional Institution. During the visit, TORION was seen with two juice bottles. TORION was observed by staff spitting an unidentified white object into one of the bottles. CORTEZ was seen taking the same bottle, drinking from the bottle, and ingesting the unidentified white object. Fox Lake Correctional Institution staff then moved in, secured CORTEZ, and terminated the visit.

50.     CORTEZ was asked about the ingested white object and did not reply.  CORTEZ was placed in restraints and taken to restrictive housing.  TORION was asked by Fox Lake Correctional Institution staff about the item from the bottle but did not reply and began to cry.  TORION and NICHOLE'S visitation privileges were suspended until December of 2024.  Your affiant believes the item passed to CORTEZ, based on the behavior exhibited by TORION and NICHOLE leading up to the visit, was narcotics.

51.     On December 12, 2023, TORION traveled by Greyhound bus lines from Minneapolis/St. Paul, MN to Milwaukee, WI.  Your affiant reviewed ping data related SUBJECT PHONE 1 which indicated the device to be in the area of the Milwaukee Intermodal Station located at 433 W St. Paul Avenue, Milwaukee, WI 53203 on the morning of December 12, 2023.  TORION was observed by agents at 4710 N. 30th St, Milwaukee, WI, 53209.  Your affiant knows this location to be where TORION received firearm parts and accessory deliveries from CBC Industries.

52.     On December 12, 2023, RONALD contacted TORION from Racine, WI, Correctional Institution.  TORION expressed intent to stay in Milwaukee a few days, then travel to Chicago, IL by train, and then to Houston, TX by train, and then travel to Dallas, TX.

53.     RONALD contacted TORION on December 14, 2023.  TORION discussed intent to travel to the "city" and said he will leave on December 18, 2023, at 1:55pm.  Your affiant reviewed train schedules from Chicago, IL to Houston, TX.  Amtrak provides a departure from Chicago Union Station at 1:55 PM on December 18, 2023, to Houston, TX, Amtrak Station.

54.     On December 17, 2023, CORTEZ contacted NICHOLE from Fox Lake Correctional Institution. NICHOLE advised CORTEZ of TORION being "out of town."  This leads your affiant to believe TORION would return after traveling to Texas.  NICHOLE placed a

17

phone call to allow CORTEZ to speak with TORION. TORION stated he was in line for the train to Chicago, IL.

55. On December 18, 2023, your affiant was notified by the Amtrak Police Department of a purchase of a travel ticket related to the phone number of SUBJECT PHONE 1. The purchase was reported as fraudulent. The Amtrak Police Department provided the following information for the purchase, Reservation #: 5349C5, Passenger Name: DAVIS/GARY, Credit Card #: Ending in 5425, Email Address: FITZCHARLES@OUTLOOK.COM, Phone number: 872-243-4797 (SUBJECT PHONE 1), Purchase Date & Time (PST): December 16 2023, 11:14P.M., Travel Date: December 26, 2023 to December 27, 2023, Travel Location: Dallas to Chicago to Milwaukee. This pattern of fraudulent activity is consistent with other fraudulent credit card purchases of firearms parts and accessories by TORION from CBC Industries and other businesses.

### Firearm Activities in Minnesota

56. Your affiant reviewed a CBC Industries sales invoice for an order dated September 21, 2023. The billing information was "Berris Reid Rncarms 20723 Morning Star Rd, Lead, SD 57753." The shipping address was "Berris Reid Rncarms 210 Front St E Unit 205, Albert Lea, MN 56007." The order was for approximately $1,177.05 and the order was for three 5" 300AAC caliber AR-15 micro upper assemblies, and two 5" 5.56 NATO caliber AR-15 micro upper assemblies. This order was consistent with other fraudulent orders by TORION from CBC Industries. Your affiant knows when these parts are paired with an AR-15 lower receiver, the parts can be readily converted to a functioning firearm. FedEx records indicated the order was delivered to the aforementioned address in Albert Lea, MN on October 11, 2023, and was signed for by "T. BROOKS" at 12:29 PM.

18

57.     On November 18, 2023, at approximately 11:30 AM, CORTEZ contacted TORION.  TORION explained he has a workshop going on.  TORION and CORTEZ discussed NICHOLE being upset over issues with TARGET RESIDENCE 1 being unclean.  TORION described having a printer, and it is one of the issues with NICHOLE.  TORION described the printer as printing plastic. TORION stated he is letting the printer run and the printer is printing plastic while sitting on a table. TORION would further describe the printer as printing money.  Your affiant knows a 3D printer to use plastic to print plastic items.  Your affiant also knows with the parts and components previously purchased by TORION from CBC Industries, a 3D printer could be used to manufacture and complete functional firearms.  TORION in the past has explained he has built and sold firearms in jail calls with CORTEZ reviewed by your affiant.  Your affiant believes the printer is being used to manufacture firearms and is not printing United Stats currency.  With the issues described between NICHOLE and TORION, this leads your affiant to believe TORION is living at the residence and is expected to help maintain the residence.

**Narcotics Activities in Minnesota**

58.     On September 5, 2023, an email communication was sent by NICHOLE to CORTEZ.  NICHOLE expressed an intent to focus on her house and her bills.  NICHOLE also stated she will "kick out gas here and there."  Your affiant knows "gas" to be a term for cannabis.

59.     On September 21, 2023, an email communication was sent by NICHOLE to CORTEZ.  NICHOLE stated she needs basic items for her residence and is struggling to afford them.  NICHOLE further explained TORION would pay a woman $40 related to a dog and

19

would also pay in "tree." Your affiant knows "tree" to be a term for cannabis. NICHOLE advised she would pay the woman if TORION did not.

60. On November 17, 2023, at 8:00 PM, CORTEZ, TORION and NICHOLE participated in a video visitation. NICHOLE stated she just got in the house. NICHOLE appears to be in a bedroom. NICHOLE'S side of the video goes blank for several minutes. When the video resumes TORION is on screen. TORION displays yellow package Backwoods brand banana flavored cigars. TORION states he is going to roll up something nice. Your affiant knows through training and experience that these types of cigars are often unrolled and used to smoke cannabis by removing the tobacco and replacing it with cannabis, and then rerolling them. TORION is seen on screen motioning his hands in a manner consistent with that of rolling and unrolling a cigar.

61. TORION expressed interest in obtaining a car to go to the city. While there, TORION would be meeting an individual identified as "Rocko" and get up with "Angie" and come back. Your affiant knows "Angie" to be a term to mean cocaine. CORTEZ asked TORION how much more he would need. CORTEZ stated he has 450 sitting on the app. This leads your affiant to believe CORTEZ has access to a financial application to exchange money.

62. On November 21, 2023, a video visit took place between CORTEZ, TORION, and NICHOLE. NICHOLE and TORION appear to be together inside a residence that is consistent with NICHOLE'S residence in Albert Lea, MN. TORION can be seen on screen and states he was putting together "the angie." Your affiant knows "Angie" to be a term for cocaine.

63. On December 3, 2023, CORTEZ contacted NICHOLE. TORION was also present during the call. TORION advised CORTEZ a box of "weed pens" were stolen by "Kai" Your affiant knows NICHOLE to have a son, a juvenile whose name contains the name "kai." I

20

am aware that on November 27, 2023, NICHOLE and TORION traveled to the Merrillville Indiana, and Chicago, Illinois area. During that time, NICHOLE stated on jail calls with CORTEZ she purchased cannabis pens and marijuana.

64.     On December 7, 2023, BROOKS contacted TORION from Racine, WI, Correction Institution. TORION advised he is in Minnesota and working. RONALD and TORION discuss money owed by TORION to individuals. RONALD lectures TORION on his behavior and actions and how it could lead to TORION being arrested. RONALD also compares TORION'S actions to the actions of his own. RONALD further described the actions of others TORION is involved with as "dope fiend" and TORION'S mistakes being a "$5,000 lesson." Your affiant knows RONALD to be incarcerated for convictions related to narcotics sales in Milwaukee County, WI. This leads your affiant to believe RONALD fears of TORION selling narcotics and could be arrested and face incarceration.

### Jail Calls of January 21–25, 2024

65.     I reviewed jail calls placed by CORTEZ to NICHOLE occurring between January 21, 2024, and January 25, 2024.

66.     On January 21, 2024, CORTEZ placed a call to NICHOLE at 4:23 PM. TORION was also present with NICHOLE during the call. TORION stated he had to "switch out this rental." Your affiant knows NICHOLE to be using a rental vehicle (SUBJECT VEHICLE 2, 2023 Nissan Rogue, white, VIN 5N1BT3BB5PC907900, Michigan license plate ETW1619) while SUBJECT VEHICLE 1 is being repaired. Law enforcement officers obtained through a subpoena that NICHOLE rented SUBJECT VEHICLE 2 from Mason City IA. TORION said he is waiting for SUBJECT VEHICLE 1 to be fixed and will take "one of these cars" and go to "the city" and "get us reloaded." TORION also explained, an individual left car keys in "the rental"

21

and TORION had to drive to the "cities." Your affiant knows "cities" to be a common nickname for Minneapolis and Saint Paul, MN. TORION discussed learning how to "print." TORION explained an individual being arrested for charges related to domestic violence, firearms and nine "switches." Your affiant knows a "switch" is a device used to covert a pistol to fire in a fully automatic mode. TORION said the individual was released from jail. CORTEZ warned TORION not to have the individual over and TORION stated the individual was "blocked" and cannot talk to TORION.

67. Your affiant reviewed Albert Lea, MN, Police Department (ALPD) reports related to the arrest of Isaac M. BONILLA ("BONILLA") at 2019 Main St E., #311 on January 13, 2024. Your affiant knows this location to be a Motel 6. Your affiant knows that in the past TORION discussed with CORTEZ buying a laptop computer and a printer at a Motel 6. During the incident, ALPD reports indicate several 3D printed firearms, ammunition, and privately made firearms firearm parts were located.

68. Your affiant reviewed cellular data related to SUBJECT PHONE 1. Your affiant located a phone number of 507-461-5276 for BONILLA. Your affiant located a CashApp profile with the display name Isaac BONILLA CashTag $MarioLMB. CashApp records for a profile related to TORION showed TORION was paid $21.00 by BONILLA on November 19, 2023. Cellular data for SUBJECT PHONE 1 also indicated outgoing and incoming communication with the phone number 507-461-5276 between November 15, 2023, and January 6, 2024.

69. On January 23, 2024, CORTEZ placed a call to NICHOLE at 7:41 PM. TORION was also present during the call. CORTEZ advised TORION that CORTEZ has "figured it out" and stated "BCF, the first and only black cartel family." NICHOLE warned CORTEZ to stop

22

and be released first.  CORTEZ further explained they are "worse" than "the Mexicans in Mexico."  Your affiant knows Mexican cartels to be involved in firearms trafficking, narcotics trafficking, and violence.

70.     On January 24, 2024, CORTEZ placed a call to NICHOLE at approximately 2:14 PM.  NICHOLE advised she has not called about her vehicle and is driving another vehicle. Your affiant knows NICHOLE and TORION to use SUBJECT VEHICLE 2 while SUBJECT VEHICLE 1 is being repaired.  CORTEZ and NICHOLE discussed plans for TORION'S birthday to include travel to both Minneapolis, MN, and Chicago, IL.  NICHOLE explained she is trying to get TORION'S girlfriend to come.  CORTEZ asked, "which one" and NICHOLE stated TORION'S girlfriend lives in Arizona.

71.     Also on January 24, 2024, CORTEZ placed a call to NICHOLE at approximately 3:37 PM NICHOLE also placed a call to TORION while on the phone with CORTEZ. NICHOLE stated she has called about SUBJECT VEHICLE 1 and the business is not open today, January 24, 2024.  NICHOLE can be heard talking to an unidentified individual. NICHOLE mentioned she does not see TORION moving when "his dad gets out."  Your affiant knows TORION'S father, Ronald BROOKS is incarcerated and nearing his release.  NICHOLE said she knows TORION has community service to complete.  Your affiant TORION to be on probation in Cook County, IL.

72.     Also on January 24, 2024, CORTEZ placed a call to NICHOLE at approximately 5:43 PM.  CORTEZ instructed NICHOLE to have TORION send CORTEZ money.  CORTEZ also instructed NICHOLE to have an individual identified only as "Duke" set up a visit with CORTEZ.  NICHOLE describes her CashApp account as "Felicia."

23

73.     Your affiant reviewed Fox Lake, WI, Correctional Institution visitation records. On January 24, 2024, CORTEZ sent a "visitation outreach request." The "visitor details" provided identified the visitor request for Name: Deangelo Alboyd-Brown ("ALBOYD-BROWN").

74.     Your affiant reviewed the criminal history of ALBOYD-BROWN. ALBOYD-BROWN was found to be convicted of Possess w/Intent-Cocaine (>5-15g) (Felony) on January 4, 2018, in Milwaukee, WI, County Circuit Court. ALBOYD-BROWN was also convicted in the same court on the same date for Possess w/Intent-Heroin(>3-10g).

75.     Also on January 24, 2024, CORTEZ placed a call to NICHOLE at approximately 6:45 PM. CORTEZ asks NICHOLE to make a phone call to TORION. NICHOLE placed a call to TORION. CORTEZ stated he would call TORION on January 25, 2024, in reference to that "Sko tip." I believe "Sko" to be ALBOYD-BROWN.

76.     Also on January 24, 2024, CORTEZ placed a call to NICHOLE at approximately 8:31 PM. NICHOLE calls for TORION to come to her. NICHOLE stated TORION is rolling a "blunt." Your affiant knows a "blunt" to be a cigar with the tobacco replaced with cannabis. TORION is present during the call. TORION stated he was "trying to make this play down in Milwaukee" and has "my lil' guy doing something for me." TORION also stated he needs to take a trip to Milwaukee because he is "almost done." TORION said he did not know if NICHOLE would not go with TORION and would later pick TORION up. TORION and CORTEZ discussed number figures for Leon ALBOYD and appeared to use coded language. CORTEZ also instructed TORION to take an unspecified item with him to have on "stand by." TORION also received a phone call from a female he described as "one of my situations." NICHOLE can be heard describing the female as "Milwaukee." In response to NICHOLE,

24

TORION stated the female lives in California but is "running around hustling" and "be on the same shit I be doing" and is in Milwaukee "on business."

77.     Your affiant reviewed cellular data related to SUBJECT PHONE 1 during the time of the call from CORTEZ.  Data from SUBJECT PHONE 1 indicated two incoming calls from the number 414-850-1409.  Your affiant knows this number to be related to Todrian FRANKLIN, a known associate of TORION.  SUBJECT PHONE 1 also communicated with the number 414-865-6073.  Your affiant knows this number to be related to Jasmine M. Riofrio.

78.     On January 25, 2024, CORTEZ placed a call to NICHOLE at 3:37 PM.  During the call, NICHOLE and CORTEZ discuss the cost to repair SUBJECT VEHICLE 1.  NICHOLE expressed concerned about the cost and the length of time for the repairs.  CORTEZ stated without the vehicle NICHOLE could not go to Chicago or do other things.  Your affiant knows TORION and NICHOLE to have traveled several times using SUBJECT VEHICLE 1 between Indiana, Illinois, Wisconsin, and Minnesota.

79.     Also on January 25, CORTEZ placed a call to TORION at approximately 4:08 PM.  During the call CORTEZ asked TORION about his plan to go to "The Mil" Your affiant knows "the Mil" to be a term for Milwaukee.  TORION stated he is unsure when he will be able to go.  CORTEZ stated "we" need to "figure something out" so TORION can do "what you got to do too."  TORION stated he "needs" to get to Milwaukee.

### Kenosha County Wisconsin Arrest – Seizure of DEVICE 9 and DEVICE 10

80.     On February 3, 2024, TORION and Jaylen BETHANY were arrested by the Kenosha County, Wisconsin, Sheriff's Department (KCSD) after a traffic stop SUBJECT VEHICLE 2 near the 2900 block of Interstate 94 in Kenosha County Wisconsin.  TORION and BETHANY were both arrested on Wisconsin state charges to include possession with intent

25

cocaine > 15 to 40 grams, possession with intent over 40 grams party to a crime, possession with intent-fentanyl (>50 grams), possession with intent designer drugs >10 to 50 grams, and possession of marijuana. Additionally, TORION was arrested on a Cook County Illinois arrest warrant.

81. Also located in the SUBJECT VEHICLE 2 by KCSD was a black bag containing small flakes that appeared consistent with metal shavings, a sealed Grey Ghost Precision aftermarket Glock pistol slide manufactured to fit a Glock 17, generation 5, version 3 pistol box, miscellaneous tools, a 5D tactical Router HG Pro, a table top Wolfcraft brand drill press vise, and an empty Ziploc style bag with a label on it which had the logo for SOTA Arms and "AR15 Lower Parts Kit." These items appeared to be consistent with the manufacturing of firearms. Your affiant knows SOTA Arms to be business that sells firearms and firearm accessories online and is located at 39719 Grand Ave, North Branch Minnesota.

82. On February 21, 2024, your affiant obtained sales records from SOTA Arms. Invoices showed several orders appeared to be fraudulent causing a financial loss for SOTA Arms or were declined by SOTA Arms between September 15, 2023, and September 27, 2023. The orders used various emails addresses known to case agents to be used by TORION and fraudulent credit card information to obtain AR-15 parts and accessories.

83. Your affiant obtained sales records from RSR Group a business which sells firearms parts and accessories online. RSR Group records indicated a Grey Ghost Precious pistol slide with matching Stock number GGPGGP175OCODV3 to the one recovered by KCSD during the arrest of TORION, was sold on August 4, 2023, by Somar Tek LLC to "Gary Adams" and shipped to 4710 N. 30th St, Milwaukee, Wisconsin, 53209. Your affiant knows this address to be used in the past by TORION for firearms parts related deliveries. Your affiant also knows

26

Somar Tek LLC to be a Federal Firearms Licensee located W191 S7691, W191S7691 Racine Ave, Muskego, WI 53150.

84.     During the arrest of TORION and BETHANY, KCSD deputies took two phones into custody.  One blue apple iPhone was taken from BETHANY (**DEVICE 9**) and a gray Apple iPhone (**DEVICE 10**) was taken from TORION. Your affiant believes the cell phone taken from TORION is SUBJECT PHONE 1. KCSD obtained a state search warrant in Kenosha County, Wisconsin for the phones on February 12, 2024, and data was extracted from both devices. Although ATF can likely use the already extracted data, out of an abundance of caution, the ATF seeks this federal search warrant to obtain the cellphone and extract the data. Because of the use of cell phones and online activity to further the crimes discussed above, Affiant believes that there is probable cause that within **DEVICE 9** and **DEVICE 10** there is evidence of criminal activity and the conspirators involved in those crimes.

### TECHNICAL TERMS

85.     Based on my training and experience, I use the following technical terms to convey the following meanings:

> a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.

27

These capabilities include: storing names and phone numbers in electronic

"address books;" sending, receiving, and storing text messages and e-mail;

taking, sending, receiving, and storing still photographs and moving video;

storing and playing back audio files; storing dates, appointments, and other

information on personal calendars; and accessing and downloading

information from the Internet. Wireless telephones may also include global

positioning system ("GPS") technology for determining the location of the

device.

b.   Digital camera:  A digital camera is a camera that records pictures as digital

picture files, rather than by using photographic film.  Digital cameras use a

variety of fixed and removable storage media to store their recorded images.

Images can usually be retrieved by connecting the camera to a computer or by

connecting the removable storage medium to a separate reader.  Removable

storage media include various types of flash memory cards or miniature hard

drives.  Most digital cameras also include a screen for viewing the stored

images.  This storage media can contain any digital data, including data

unrelated to photographs or videos.

c.   Portable media player:  A portable media player (or "MP3 Player" or iPod) is

a handheld digital storage device designed primarily to store and play audio,

video, or photographic files.  However, a portable media player can also store

other digital data.  Some portable media players can use removable storage

media.  Removable storage media include various types of flash memory

cards or miniature hard drives.  This removable storage media can also store

28

any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.   GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments, or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering

29

data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending, and receiving e-mail, and participating in Internet social networks.

g.  Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be

30

assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

86. Based on my knowledge, training, and experience, your affiant knows that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

87. There is probable cause to believe that things that were once stored on the device may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, your affiant knows that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so

31

because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

88.  Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when.  There is probable cause to

32

believe that this forensic electronic evidence might be on the device because:

    a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

    b.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.    The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely

33

reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

89. Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

90. Manner of execution. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

34

## <u>ATTACHMENT A</u>

## Property to Be Searched

1.     Data extracted from (2) cellular phones further described as;

    f.   Blue Apple iPhone, listed under Kenosha County Sheriff's Department case number 24-304772 inventory #9 and extraction data (**DEVICE 9**)

    g.   Gray Apple iPhone, Kenosha County Sheriff's Department case number 24-304772 inventory #10 and extraction data (**Device 10**)

## ATTACHMENT B

### Particular Things to be Seized

1.      All records on and from the two (2) cellular phones listed under KCSD case number 24-304772 item #9 and #10 (**DEVICE 9** and **Device 10**), related to violations of Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(a)(1)(A) (engaging in a firearms business without a license); 18 U.S.C. § 922(g)(1) (unlawful possession of firearms and ammunition); 18 U.S.C. § 922(d)(10) (sale of a firearm to a person who intends to use it for a felony or a drug trafficking crime); 18 U.S.C. § 933 (trafficking firearms); 18 U.S.C. § 924(c) (possession of a firearm in furtherance of crime of violence or drug trafficking crime); 18 U.S. Code § 1029  (Fraud and related activity in connection with access devices) 18 U.S. Code § 1028A (Aggravated identity theft) 18 U.S.C. § 371 (conspiracy); and 18 U.S.C. § 1341 (mail fraud), between the dates of March 15, 2019 to the present, are being committed or will be committed by Torion R. BROOKS, Nichole BROOKS and others, including:

1.      Items:

      a.  lists of contacts with any identifying information;

      b.  photographs, videos, or other media storage connected to drugs and firearms;

      c.  types, amounts, and prices of drugs and firearms purchased/sold;

      d.  any information related to sources or purchasers of drugs and firearms (including names, addresses, phone numbers, or any other identifying information);

      e.  all bank records, checks, credit card bills, account information, and other financial records related to drug and firearms commerce.

2

2. Any and all financial records connected to the purchase/sale of firearms or drugs;

3. Documentation establishing the identity of the individuals in control of the residences;

4. Any and all financial records connected to the purchase/sale of firearms, and any correspondence regarding other firearms/drug sellers and/or purchasers;

5. Any evidence of firearm and illegal drugs or controlled substances, paraphernalia associated with controlled substances including scales and other weighing devices as well as packaging materials and containers used to package controlled substances;

6. Any evidence of proceeds of firearm and drug trafficking activities, including United States currency;

7. All bank records, checks, credit card bills, account information, and other financial records; financial records, documents, statements, or other evidence of control of bank or other financial accounts and investment funds;

8. Lists of firearm and drug customers and related identifying information;

9. Personal address books, telephone bills, photographs, letters, personal notes, documents, and other items or lists reflecting names, addresses, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in firearm and drug trafficking activities.

10. Any evidence of documents and deeds reflecting the purchase or lease of items obtained with the proceeds from firearm and drug trafficking activities;

11. Records of off-site locations to store proceeds and other records, including safes, vaults, or lock boxes, safe deposit box keys, records and receipts and rental agreements for storage facilities;

3

12. Records of mail and communications services, cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and or video recordings, pictures, settings, and any other user defined settings and/or data.

13. Evidence of indicia of occupancy, residency, or ownership of premises, including utility bills, telephone bills, loan payment receipts, addressed envelopes, escrow documents and keys.

14. Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

15. Records evidencing the use of the Internet Protocol address, including:

   a. records of Internet Protocol addresses used;

   b. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

4